Case number 25-5630 Mary Eitel v. Stoll Keenon Ogden PLLC Oral argument 15 minutes per side. Mr. Horn for the appellant. Good afternoon. My name is Hill Horn. I am counsel for the appellant today. If it would please the court, I would like five minutes reserved for rebuttal. I will focus mainly on two issues today, that being the statute of limitations, which was the focus of the district court. And then my secondary focus will be on estoppel doctrines and the potential disability of the appellant. Now, to begin, the district court's, the lion's share of its decision relied primarily on appellant's pleadings in a sister case, of which this court is aware, in which appellant, as a vested remainder beneficiary, brought litigation against multiple bank trustees of multiple generation skipping trusts drafted and created by her grandparents. Which over the course of time, there were issues of concealment. And I think that the overarching theme here is that the entirety of the district court's reliance on the prior district court case, the trustee case, I shall call it, is that the facts that it relies upon, unfortunately cloud the law in Kentucky when it comes to discovery of causes of action for professional negligence. The most important thing for appellant to convey to this court today is the inherent latency of her claims, mainly by the fact of the distance between her and those with duties of disclosure through the decades. So she filed a case in 2020. It wasn't against her lawyer, but it was against the trustees. So why couldn't she have sued the lawyer at that point? Because at that point, the lawyer's alleged negligence, which came later, was not an issue in litigation because it was not the position of appellant in that case that the lawyers had made any sort of error or mistake. When you said the lawyer's negligence, which came later, it wasn't the occurrence of the negligence that came later. It was your involvement with it. Is that right? I believe that a proper reading of the case law in Kentucky, which is admittedly quite unclear and admitted so by the Kentucky Supreme Court in Wolf v. Kimmel, in which they tried to clarify the issues of the occurrence rule between non-litigation and litigation malpractice, I think a strong argument can still be made that occurrence requires not only irreversible damages, which is the focus of the Wolf v. Kimmel opinion, but unfortunately it doesn't discuss the fact that the negligence itself must be irreversible as well. Well, that didn't answer my question. I was simply addressing your statement, as I heard it, that the lawyer's negligence came later, that is, after the judgment in the first case. And I said I understood their alleged negligence was what happened with the drafting and so on well before the first case was brought, correct? Correct. Okay, that was my only question. And to follow up with that, just to clarify, the appellant's position is that for the occurrence rule for the statute of limitation, the triggering event is the district court's final order in the sister case, in which on page 11 of that order, although not germane to the holding of that order, the court makes the decision and opinion that the encroachment provisions, which was at issue in the sister case, were broad terms, which with that interpretation is the triggering event which would then bring the irreversible. Broad terms, in other words, gave the trustee broad discretion to make these allocations to your client's father, right? Correct. But did your client have a copy of the trust? When did your client get a copy of the trust agreement? So the trusts, the three trusts came in force, two of them in 1970 with a marital deduction trust for the grandmother. When she deceased in 1977, all three trusts came into force. Appellant did not come into possession of the actual trust instruments until 2004. Okay. And so at that point, she sees the language that says that the trustee has some discretion to pay out these monies that you think have been paid out improperly. So why doesn't the clock start then? Because in order to make a determination whether or not they are proper or improper requires a disclosure of the recipients and the purposes because the encroachment provision, based on appellant's understanding from the sister case, which was eradicated by the district court's order in that case, was that these were ascertainable standard provisions. The 2020 case also? When you filed the 2020 case, didn't that also rely on understanding some of the things you've just reflected? The 2020 case relied entirely on the belief and understanding that these were narrow, ascertainable standard provisions, meaning that the recipients were restricted and the purposes were restricted, but because those pieces of information were never disclosed, it would be inherently speculative for appellant to determine one way or another whether they were appropriate or inappropriate. And then that case went on for a while, and there wasn't, you know, in the first year of that case, for example, there was nothing that came to light that suggested that maybe there could be some malpractice by the lawyer some decades ago? No, and the reason being is that the primary focus of the defendants in that case, including party counsel appellee here was party counsel to one of the defendants in that case, was statute of limitations. Their focus was on the identification of distributions in isolation, which appellant maintains here today and will maintain before this court at a later date, is also the inappropriate standard for professional malpractice because it is appellant's belief that that constitutes a harm, but not necessarily an invasion of legal injury until she comes into possession with the information demonstrating that there may be inappropriate recipients or inappropriate distributions for purposes wise. Can I take you back to one of your original statements was you said the litigation, what we call the first litigation against the trustees, and you said something like, which involved issues of concealment. Did you mean concealment by the trustees or concealment by the lawyers, or what did you mean there? So it is irrefutable that from 1970 through 2004, the trustees, there were two of them in that case, disclosed no information material to administrative positions, whether it be distributions or any sort of relationship with other beneficiaries. The only disclosure made that was identified in that case. That's against the trustees. Correct. I was probing for whether you're claiming concealment by the attorneys, which would allow you to toll the statute of limitations. And I, at least at first blush, I didn't see that, but I wasn't sure whether you were claiming that, that you knew that as of the time you were suing the trustees. In short, in the 2020 suit, in this current case, yes, we are alleging concealment by the lawyers. Of what and when? Of appellant's interests in the trusts, appellant's interests in the estate of her grandparents, and failure to disclose material information when appellee was counseled to the original executor and the original trustee of the three trusts. So you were just saying that about the concealment of interests of the appellants, that's your people. Correct. Who, if they had the trust instruments, how could they have concealed their interests in that? Well, I think the ultimate issue here is that these trusts and estates got off on a terribly wrong foot for appellant because it took 24 years in order to get the trust instruments themselves, and then there was no ability to get paperwork in that other sister case regarding prior decisions and administration, which is also found in the facts. The problem is she has a trust agreement. She has an inkling that there's payments that are improper under the trust agreement, and she even knows to sue some individuals who have some responsibilities to the trust, the trustees, but doesn't sue the lawyer. And it's a little hard to accept that she wouldn't have been under the obligation to sue the lawyer at that point as well. One possibility is the trustees are making wrongful distributions. Another possibility is the lawyer wrote the trust in a way that didn't coincide with the creator's intent. And, yes, it does happen that more information came out later on, but there's a reason why we have limitations periods because we want people to sue at essentially the earliest possible time so that all the relevant information is preserved. I'm just having a little trouble accepting why she couldn't have sued actually well before 2020. Obviously, the prior case that she could have sued the trustees well before 2020, it's a little hard for me to believe that she couldn't have sued the lawyer as well well before 2020, let alone in 2020 when she did bring suit. I think that's where appellant's disability comes into play. I think the issue there is a fact determination issue in which a discovery period in which the true nature of what she knew or did not know and what she could or could not know. I think the passage of time. I think the district judge said how could she authorize you to file this case if she was. Correct. I think that there is an issue. So appellant filed the case pro se initially. She brought on counsel later on. But I think that there's strong arguments to be made that the original sister case lacked standing because it was all upon information and belief. And not to get off topic, but in this case, I think that the district court in this case used appellant's pleadings upon information and belief in that sister case as knowledge, yet when appellant pleaded in this case in response to the 12B6, that it was her information and belief that appellee had concealed themselves during that case in order to induce silence and prevention of amending of the complaint, that the district court then said that that is mere suspicion. So the hypocrisy of one claim being speculative and one being not, it seems somewhat hypocritical in the logic of that determination. One more question. I don't want to take all your time. Do you have a question? Go ahead. On the issue of disability, was the issue of disability brought up in the first motion or was that only on reconsideration that it was raised? I believe the disability was first brought up in this district court case on the motion for reconsideration. So if it wasn't brought up, and didn't the district court in fact say that it wasn't brought up in the original motion and appellant essentially brought forth no information indicating why it couldn't have been brought up on the front end? Correct, yes. So why should we consider that? I believe that under the auspices of serious injustice, I think that the problem that I see with at least the main primary damage here, which is the improper encroachments that this panel has highlighted, I think the problem is that if this panel or this court rules in appellant's favor in the sister case as it pertains to statutes of limitations and estoppel doctrines, then that can at least in part eviscerate certain claims against appellee here, which is why appellant places the district court's final order in the sister case as the occurrence of when the negligence became irreversible. The other question I had, and maybe this isn't completely dispositive, but I'm wondering how you would prove this case. So the reason that we have limitations periods are to encourage people to sue at the earliest possible time so that evidence is preserved, memories are preserved, people are still alive. And in this case, I mean the wrongdoing happened in the 60s and the 70s, right? Everyone who is involved is dead, I think. Your client is alive, but you have alleged she has a mental incapacity for some reason. How in the world would – what evidence could possibly be collected that would speak at all to proving these kinds of claims? Well, I think that one of the foundations of appellant's case is the intent of the testators. What were these trusts supposed to be? Were they supposed to be generation-skipping trusts with ascertainable standards, or were they supposed to be generation-skips with unascertainable standards? And I think that the documents themselves and the information which was held by some of the banking defendants in the sister case confirmed that these were intended to be ascertainable standards. Another thing that during the – You're saying there's some records held by the bank that might speak to this. Correct. So there's no witness alive, right? Who could speak to any of this? I think that there are witnesses alive, and the reason I say that is because undiscovered until at least early of 2023, within one year of filing of this case, it became apparent that Apelli's predecessor was engaged in a very similar lawsuit for 11 years in federal court in Florida over the very same issues. And in that case, Apelli vociferously defended itself and its drafting of near-identical trust instruments created for Appellant's grandfather's business partner that they were ascertainable standards. So when getting to the sister case and finally discovering those other forms from the Jacksonville archives, it became apparent that Apelli, arguably in Appellant's position, had a duty to disclose their participation in the drafting and creation of these trusts, at least by their predecessors. And not only that, but their position that they were ascertainable standards, even though they argued the opposite on behalf of their client in the district court in the trustee case. Any other questions? All right. We gave you a lot of time, but we'll give you extra time for your rebuttal. Thank you. Thank you. May it please the court. Mr. Horne, my name is Amy Kovach, and along with my colleague David Tackaw, I am honored to represent the distinguished Kentucky law firm Stahl-Keenan-Ogden before you today. Also with us today in the courtroom is A.J. Singleton, who is Stahl-Keenan-Ogden's general counsel. And we are here today to ask you to affirm the well-reasoned opinion of Judge Stivers dismissing the claims. We understand that Ms. Idle is unhappy that she did not share in her grandparents' inheritance to the same degree as her father. And I'm sure that you all are well aware that that is not an uncommon complaint among residual beneficiaries of multigenerational trusts. While she's entitled to have concerns about how the money was spent and the fact that not as much as she'd hoped would be left was there when she received it, it doesn't mean that she is entitled to bring Stahl-Keenan-Ogden into court in 2023 to answer for that. To allow Ms. Idle's claims to proceed at this point would undermine, as you noted, Judge Redler, I am so sorry. Okay, Redler.  The very purposes of the statute of limitations. Just as you noted in your dissent to the denial of, we're hearing on Bonk, in the Snyder Hill versus the Ohio State University case, where you noted there the fundamental unfairness of asking the university to answer for claims that were over 40 years old, older than some of the members of the court. And you also recognized... That was a dissent, so... Well, it was, but, and I'm happy to get into that. But it does explain the very nature of statute of limitations. And I understand there the issue was over whether there was an implied discovery rule under Title IX. We have a very different issue here. So the... If someone's in... So everyone agrees that the purported beneficiary was in possession of the trust agreement. It has some explanation for how disbursements are going to happen. But would you agree that the... She didn't have information about how they were made, or sort of the nature they were made, or for what purpose they were made? And that wasn't learned until the last litigation in the 2020 case? I think I would disagree with that. But I don't know that we need to get into those facts. If you look at Judge Jennings' opinion in the trustee case, which is not before us, but she goes through exhaustive facts about how, at least by 2004, Ms. Idle had both the trust document and quite a bit of information, and in fact hired a lawyer and brought her son, her counsel here today, and a lawyer and herself to meet with the trustee in 2004 to talk about the nature of the distributions. I also believe it was undisputed that she was receiving annual statements at that point regarding the distributions. Judge Jennings sets forth a whole list of, a flurry of e-mails and complaints from Ms. Idle and her retained counsel at the time to the trustee complaining about the scope and nature of the distributions to her father and her then stepmother. So, and this was confirmed by her own pleadings that she put into the record in the trustee case. She put a declaration in the record admitting to this fact. Did we take notice of those in this case? Since we're at a motion to dismiss posture, how do we treat the record from the prior case or an opinion from a prior case? Well, and I believe that's why Judge Stivers very smartly found that while you could go back further, and we argue, I think you can take notice of the declaration that Ms. Idle put into the record regarding that 2004, I think she's judicially stopped from denying those words. But as Judge Stivers found, at the very latest, when she filed her complaint against the trustees, she was on notice of possible negligence and her injury. Therefore, the statute of limitations was running at least as of the filing in 2020, and this action was not filed until 2023. You don't have to go into the facts of the underlying case. Isn't it quite a different theory to think that the trustees have mismanaged the allocations as opposed to the lawyer created it in an improper way? I mean, those are quite different theories, I think. They are different theories, but... The ones in the execution versus the original drafting. Yes, but Kentucky jurisprudence regarding the statute of limitations says that you don't have to know the identity of everyone who's done you wrong, essentially. As long as you know that you have an injury, you are on inquiry notice, and you have to figure out who all may have been responsible for that injury within the one year statute. Identity is when you don't know their name, but you have to sort of have a sense. You have a sense of who the actors are. You don't know the lawyer's name, but you have a sense that maybe improper legal advice was given here or there was a deficiency in the drafting of the document. Well, Ms. Idle, in fact, if you look at the facts of the Idle versus PNC case, the trustee case was having this very dispute over what this language meant, and the trustees consistently from the first trustee all the way through the end of the trust told her, no, this language allows us to make these distributions. And, in fact, had lawyers sending letters and the trustees' lawyers responding back, no, this language very much permits us to make these distributions. So she was on notice. But you're saying this was in 2021, 2022? No, this was starting in 2004. I thought you said this was during the litigation, these statements. No, these statements were made consistently from the trustees during the administration of the trust. When Ms. Idle would complain that they were giving her father too much money, they always pointed back to the trust language and said, this language allows us to distribute this money. We will continue to do so. And the way we can consider those statements here in a 12B6 posture in this case is judicial estoppel? Well, there's a combination. Ms. Idle's complaint itself refers to, as they have done here, refers to the filing and then Judge Jennings' order in 2023 as the basis for this lawsuit. So under traditional 12B6 principles, she has bootstrapped in the pleadings, the filings in the trustee lawsuit. So we do think it is proper and it was proper for Judge Stivers to rely on the complaint that she filed in that action, showing that she had notice of her injury. And we understand, too, that Judge Jennings' opinion is not final. So it would be at this point, I don't believe you could use a race judicata kind of concept there, but we do think that it is appropriate to look at the statements and pleadings that Ms. Idle herself and her counsel put in the record in the other case. Does that answer your question? Thanks. Counsel also noted and made comment that Kentucky statute of limitations jurisprudence is unclear. I think that is demonstrably not true with the issuance of the Wolf v. Kimmel case in 2023. The Kentucky Supreme Court took great pains to harmonize and clarify its jurisprudence, and it is clear that not only does the one-year statute of limitations control all the claims against this case, that the occurrence is when negligence is irrevocable and non-speculative damages, the claim will accrue. And here the claim clearly accrued sometime well before even the 2004 date and certainly before the 2020 date. And specifically, Wolf v. Kimmel rejected any sort of claim that the claimant must be told specifically that the damage is tied to legal malpractice. So that has been rejected twice by Kentucky courts, also in the Conway v. Huff case. So to the extent that appellant urges you to look at out-of-state jurisprudence or any principles of equity, Kentucky law has spoken to this. It may feel like a harsh result, but it is the law. And statutes of limitations are there to be predictable and to give people clarity. On that note, I made the point to your friend on the other side that I thought it would be very difficult to prove this case. This is the whole reason we have statutes of limitations, because it's hard to go back 60, 70 years. But he pointed to two sources of information that might inform litigation. One are some documents that were held by the trustees, I think, or maybe the law firm or both. And then another case where it was purported that the same lawyer or law firm had engaged in potential malpractice in related ways involving the original creator of the trust. So any thoughts on whether any of that would be relevant, admissible, speak to any of these issues? I'll take those in reverse order, if that's okay. The litigation regarding the Boone Porter estate, and that is discussed a little bit in the briefing. Mr. Porter was the business partner of Paul Idle Sr., and they did share common counsel and had estate plans made. There is absolutely no evidence whatsoever beyond mere speculation that they would have had the very same goals, aims for their estate plans. In the Boone Porter case, Mr. Porter's son, who then lived in Florida, so adding another layer of distinction, had an IRS problem, another thing we don't have here, regarding whether or not it was an ascertainable standard, and ended up suing the scrivener, which was Ogden Newell & Welch, the predecessor firm. In that matter, it was all tied to the issue of an IRS tax issue, which has never occurred here. There's never been even an allegation that the tax aims that the Idles had failed here. So that makes it two steps removed. We had an overlay of Florida law. There was an actual IRS potential assessment, and there has never been a claim here that the Idles' tax goals were, in fact, frustrated. All of this is supposition by someone who, in the briefs, admits she was 13 when these were made. We have no one alive who can talk to what the Idles actually intended for there. Now I'm getting into the second issue. Mr. Robertson retired from the practice of law. This is not in the record, but Mr. Robertson retired from the practice of law in 1984. That was two years after Ogden Newell & Welch's last interaction with this trust. He died in 2001. There is literally no one alive that could speak to the actual motives of the Idles in setting up these trusts, which, as we know, are a contract, and they have clear language. It says what it says, and then to collaterally attack that 40, 50, 60 years later is unfathomable. Are there some documents, though, that at least potentially speak to this issue? I believe that— I don't want you to admit something. I thought it was from the other case, so— Well, I believe Mr. Horn may be referring to simply the internal documents of the trust administrator saying that, you know, usually when you do a trust review, you review the language and see if it allows you, gives you the discretion to make the distributions that are being requested, and they did. And that's what they're referring to. It is then the next leap that my grandparents obviously intended for all of this money to survive to me because of a tax consequence that has never occurred, because there has been no finding that these failed any kind of tax testing. If the court does not have any further questions, I'm happy to sum up, and I would like to clarify for Judge Davis. The first time that disability was mentioned was actually in response to the motion to dismiss. It has never been pleaded. At that point, appellant attached a 2017 disability report that was available at the time of filing of the complaint, made no mention of disability in filing the complaint, and this disability report actually talked about how she was capable of taking care of herself. It did not speak to the high standard of legal disability. So in the order granting the motion to dismiss, Judge Stivers disposed of it on that basis. After the fact, even though this was even dealt with in the underlying case, appellant went and got a new disability report and then submitted that in the Rule 59 and 60 motion and tried to tender that as newly tendered evidence. And there, Judge Stivers said this was a report that even if it met the high standard, which it didn't, could have been obtained prior to adjudication of the original motion to dismiss. So as we've been discussing thoroughly, Ms. Idle's claims are based on legal work performed for her grandparents, primarily in the 1960s and 1970s. Stull Keenan's predecessor firm ceased its representation with respect to these trusts in 1982. Ms. Idle admitted in the trustee litigation that she had actual knowledge of the trust language and that the trustees' multiple payments of principle no later than 2004, and she brought legal action against the trustees in 2020. And in fact, she challenged the final settlement of the trust in Jefferson District Court, and those challenges were all rejected, and that was final in March 2022. Allowing this case after all of this time to move forward would allow her to repudiate her own words in pleadings filed before the Western District of Kentucky, and it would undermine the Kentucky Supreme Court's careful recalibration of its statute of limitations in Wolf v. Kimmel. We therefore respectfully request you to affirm the well-reasoned opinion of Judge Sivers. Thank you. Thank you very much. Mr. Harney, you have five minutes, I think, for rebuttal. I'd like to address two main points to this panel in rebuttal. Number one, I think that this panel is kind of curious as to how this case could go forward because of the age, because of the passage of time. Counsel for Apelli has just made an error as to who is available. I will import to this court that Boone Porter III, the grandson of Boone Porter Sr. from the Porter litigation, is well alive. In fact, in conversations with him, he has made – Sorry, I didn't mean to kill off everybody in the case. No, no, it's okay. I'm happy to hear that. So this is a third general. Correct. What information would you have about the grandson of the business partner?  So the testator. So the testator for Appellant was Paul Idle Sr. The testator for Boone Porter III was Boone Porter Sr. They were business partners and owners of Porter Paint Company in Louisville. But as far as people that are alive and well, first of all, Stephen Watkins was counsel for the trustee and engaged, I believe, by the trustee and was an attorney for a predecessor of Stahlkehn and Ogden Apelli here. And so he is alive and well and can speak to the intentions of testators because he was participating in the legal matters involving – This is the intention of the testator, the creation of the document in the 60s and 70s.  And this is well after the fact. So in the discussion with Boone Porter III, it became germane that – and these documents are confirmed in the Porter litigation – is that the Porter legal documents and the Idle legal documents for testamentary work were kept in, at least by 2001, by Stahlkehn and Ogden in a similar file together with the company file. So they were intermingling both the Porter Paint Company corporate file with the testamentary documents of the two founders and co-owners. But as far as the case law, referring to Wolfrey Kimmel, the district court here relied significantly on Conway v. Huff. My beef with Conway v. Huff is Conway v. Huff actually gets the standard of law wrong and it's refuted by its own Supreme Court in Adams v. Eisen. Conway looks to medical negligence and the identification to a claimant of a sponge in the body as the trigger for the occurrence. But in fact, both Alliance v. Wiseman also at the Supreme Court and a medical negligence case subsequent to Conway and then Adams v. Eisen 30 years before Conway, both identify that it is not the identification of the sponge that is the trigger point. The trigger point is when a professional practitioner has identified that the sponge is in fact a medical issue. Because in the Adams v. Eisen case, a claimant was told by their physician that a sponge in the lung would be fine and would dissolve. It was only until 25 years later when they experienced a lung collapse that they finally identified that it was not going to be benign. I would say the same issue here with distributions of principle under an ascertainable standard. In the trustee case, that only arises to a harm. It does not transform into a legal invasion of interest unless and until the broad versus narrow issue is determined. If it were broad, then a pallant would have no claim against the trustees. If it were narrow, then the claim would clearly be at least for removals against the trustees. You plead the case in the alternative. You sue all the defendants and you say either you screwed up or you screwed up or maybe both of you, but there's competing theories. I guess the panel is still wondering how in the world could counsel in the trustee case not identify the scrivener here, the passage of time and the changing of corporate structures. There was no indication in the trust documents or in the discovery in that case which would have identified a PEL-E as having been related to the scrivener of these trusts. Then if I get, I have one more minute going here. I'd like to address in the Porter litigation, a PEL-E tried to distinguish it saying that it was an IRS issue. It was only an IRS issue in result. It was actually identical to the trust issue in the trustee case. The issue in the Porter litigation was that the trust clauses, the issue was whether they were broad or narrow. The reason that mattered is that if they were broad and unintentionally so, when a subsequent generation died, the entire trust would be includable in their estate for tax purposes. But that is only one purpose of these generation skipping trusts. Another purpose is to pay tax before, which this is before the generation skipping tax existed, to assure that over generation, over generation, tax-free money can grow over time to be distributed to successive generations. But make no bones about it, the issue was the breadth of the terms. And in that case for 11 years, a PEL-E's predecessor vociferously defended that they were narrow encroachment provisions. One question based upon something your friend on the other side said. She said that it was appropriate for us to rely on some of the documents or some of the submissions in the prior case, because in your complaint you sort of invoked the prior case against the trustees to help sort of buttress your claims. Does that sound right to you? I believe that under, I believe it's Bassett versus the NCAA, which I can brief the court on. I believe that in the pleadings in the district court in this case, simple reference to the ongoings of that case, if it doesn't include attachments of the information and documents, that it would be inappropriate for the district court to review those. While they are public documents, plaintiff's petition, or complaint rather, plaintiff's complaint at the district court in this case did not include or attach any facts or evidence from that case. So I believe that the standard rose inappropriately to the summary judgment standard when the court was making its decision. Okay, well thank you very much. Thank you. Well-argued case on both sides, and it will be submitted.